IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LORIE ANN PAIGE, | ) | CASE NO. 1:20CV1249 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Lorie Ann Paige ("Paige") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. 1383(c). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 17.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Paige filed an application for SSI in October 2017, alleging a disability onset date of September 1, 2016. Tr. 17. She alleged disability based on the following: knees, injuries to her back, bilateral shoulders, right wrist, left elbow, and bilateral feet, and right hip pain. Tr. 239. After denials by the state agency initially (Tr. 75) and on reconsideration (Tr. 122), Paige requested an administrative hearing. Tr. 147. A hearing was held before an Administrative Law Judge ("ALJ") on May 22, 2019. Tr. 35-51. In his June 18, 2019, decision (Tr. 17-29), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Paige can perform, i.e., she is not disabled. Tr. 27-28. Paige requested review of the ALJ's

1

decision by the Appeals Council (Tr. 202) and, on April 6, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Paige was born in 1969 and was 48 years old on her application date. Tr. 27. She obtained her GED in 1989 and reported past work as a housekeeper. Tr. 285

### B. Relevant Medical Evidence[1]

On June 7, 2016, an x-ray from the Cleveland Clinic of Paige's lumbar spine showed disc space narrowing at L5-S1 and mild degenerative changes of the facet joints in her lower lumbar spine. Tr. 969.

On May 26, 2017, Paige saw Dr. Maleki, M.D., Ph.D., at the Cleveland Clinic complaining of low back, neck, and extremity pain. Tr. 795, 797. Upon exam, she was pleasant, in no acute distress, displayed "pain behavior," and was fully oriented. Tr. 797. She had diffuse tenderness to palpation in her extremities and paraspinal muscles and spasms in her paracervical muscles. Tr. 797. Her extremity and spinal range of motion were preserved despite her reports of increased pain. Tr. 797. She had no motor weakness and her gait was preserved. Tr. 797.

On July 28, 2017, Paige saw podiatrist Michelle Dunbar, DPM, at a Cleveland Clinic affiliate for bilateral painful bunions. Tr. 784, 791. She also reported back pain and sciatica. Tr. 791. She was diagnosed with bunions, referred for x-rays, and Dr. Dunbar requested approval for bunion surgery. Tr. 793. In August, Paige followed up with Dr. Dunbar and surgery was scheduled on her left foot for September 2017. Tr. 788.

---

[1] Paige challenges substantive aspects of the ALJ's decision with respect to her mental impairments and, with respect to her physical impairments, only challenges whether the ALJ fully developed the record. Accordingly, only the mental evidence and the physical evidence necessary to provide context for her argument regarding record development are summarized and discussed herein.

2

On September 5, 2017, Paige went to the emergency room at University Hospitals reporting back pain and sciatica from a bus accident the week before in which she bumped into a pole. Tr. 1040. She rated her pain as 9/10. Tr. 1040. Upon exam, she appeared well, was fully oriented, and in no apparent distress. Tr. 1041. She had normal muscle tone and strength in her extremities, positive straight leg raise testing, pain with palpation of the right sciatic notch, and a bruise on the right side of her lower back. Tr. 1041-1042. She ambulated with a steady gait with no difficulty. Tr. 1042. She was given medication injections (Toradol and a muscle relaxant) and discharged. Tr. 1042.

On September 29, 2017, Paige had a lumbar spine MRI at University Hospitals, which showed multilevel discogenic degenerative changes and facet arthropathy of her mid to lower lumbar spine. Tr. 1044.

On October 12, 2017, Paige saw Matthew Yanik, DPT, at a University Hospitals affiliate for physical therapy for her low back and right hip pain. Tr. 1064. Upon exam, she had a reduced lumbar and hip range of motion, reduced bilateral hip strength, and global tenderness to palpation from her right hip extending to her low back. Tr. 1066. Dr. Yanik noted that she gave inconsistent effort upon strength testing. Tr. 1065, 1066. On November 14, at her fourth visit, she reported no change in her pain. Tr. 1056.

On November 10, 2017, Paige saw Certified Nurse Practitioner Meredith Walters at University Hospitals for right low back pain for the past two months stemming from her recent bus accident. Tr. 1049. She reported a history of "sciatica/herniated disc" that had flared since the accident. Since an initial evaluation with orthopedics, she had not followed up. She was in physical therapy. She was not currently receiving mental health services. Her muscle relaxants hadn't really helped so she had stopped taking them; she was unable to take ibuprofen due to

3

stomach ulcers, and she had been using her prescribed diclofenac for pain relief occasionally. She rated her pain 8/10 and also reported tingling in her lower extremities and right knee instability. Upon exam, she was in no acute distress, had a normal gait and station, tenderness to palpation along the length of her spine, intact range of motion in her spine but pain with rotation and lateral bending to the left, a normal range of motion elsewhere and full strength, normal sensation, reflexes, and coordination, low back pain with toe walking, positive right sided straight leg raise testing while seated, and hyperpigmentation on her lower right back. Tr. 1050. Her insight and judgment were intact, and her memory, mood, and affect were normal. Walters assessed sciatica of the right side and depressed mood. She refilled Paige's diclofenac, counseled her to use heat and ice, advised that it was important she stay active, and recommended she follow up with orthopedics and obtain a primary care provider. Tr. 1051.

On December 8, 2017, Paige had a right hip x-ray which showed a CAM-type deformity of the right femoral neck and was otherwise unremarkable.[2] Tr. 1121. On March 24, 2018, she had a lumbar spine MRI which showed facet and ligamentous hypertrophy at L4-5, and, at L5-S1, a posterior disc bulge with facet and ligamentous hypertrophy combining for mild canal stenosis and mild compromise of the foramen. Tr. 1122. The impression was mild degenerative changes at L4-L5 and L5-S1 and no focus of moderate or high-grade stenosis.

On April 16, 2018, Paige had lumbar surgery: a right L5-S1 microdiskectomy and lateral recess decompression performed by Dr. Eubanks at University Hospitals. Tr. 1098. Dr. Eubanks noted the following, preoperative indications: Paige had intractable lumbar radiculopathy secondary to lateral recess stenosis in conjunction with an L5-S1 disc herniation with compression of the traversing nerve root and had failed non-operative management.

---

[2] A CAM deformity is an abnormal bump that develops on the head-neck junction of the hip ball. See https://newsnetwork.mayoclinic.org/discussion/mayo-clinic-q-and-a-understanding-and-treating-hip-impingement/ (last visited 7/14/2021).

4

On May 1, 2018, a post-operative x-ray of Paige's lumbar spine showed mild degenerative changes. Tr. 1100. On June 28, 2018, x-rays of Paige's hips and pelvis showed mild bilateral hip and pubic symphysis osteoarthritis. Tr. 1101.

On November 29, 2018, Paige visited the emergency room at University Hospitals for wrist pain after she slipped on ice and fell the day before. Tr. 1090. She denied neck or back pain. Upon exam, she was oriented, in no apparent distress, and had no spinal tenderness. Tr. 1092. She also complained of injuring her left hip, but she was able to ambulate without difficulty. Tr. 1090.

**C. Function Report**

On June 25, 2016, Paige completed a function report in conjunction with her application for disability. Tr. 275-282. She stated that she was constantly in pain. Her typical day included walking her child to and from school, shopping for groceries, and paying bills. Tr. 276. She walked, bathed, and brushed her pets. Tr. 276. Pain affected her sleep. Tr. 276. She had difficulty with certain tasks but took care of all her personal care needs. Tr. 276. She cooked, cleaned, and did laundry; her son helped carry her clothes up and down the stairs. Tr. 277. She walked, used public transportation, and shopped. Tr. 278. She did not socialize with others but went to physical therapy twice a week. Tr. 279. She had no problems getting along with others. She alleged pain with all bodily movements, but no issues when talking, hearing, or seeing, understanding or following instructions, or with her memory. Tr. 280. She could walk six blocks before needing to rest. Tr. 280. She could pay attention for long periods of time if her pain was not too high. Tr. 280. She handled stress "pretty well" if her pain was low and was "ok" handling changes in routine. Tr. 281. She got along fine with authority figures and had never lost a job due to problems getting along with others. Tr. 281.

**D. Opinion Evidence**

**1. Consultative Examiner**

On November 22, 2017, Paige saw Dr. Faust, Ph.D., for a psychological consultative examination. Tr. 1077-1083. Paige had taken public transportation to the exam. She advised that this was her seventh application for disability benefits, citing health issues and depression. She stated that she had left her last job, which she had held for one year about 25 years prior, after having had a verbal altercation with her supervisor when he kissed her when she had fallen asleep at work. She had had counseling "a bit" for depression "a long time ago" and had not taken antidepressant medication since 2004. She reported a history of suicide attempts; her most recent was in 1993, and the last time she had suicidal ideation had been the previous month. She explained, "Sometimes you get so tired you don't want to do it anymore." Her dog was her only friend and she remained in bed all day four days per week. She described feeling depressed, withdrawn, and hopeless, and having crying spells, showering less, and having less interest in socializing.

Upon exam, she was dressed in clean, appropriate clothing and had adequate grooming. She was very sluggish and slow moving, appearing fatigued. She was cooperative, sad, polite and motivated. Her posture was closed and she became emotional during the interview, crying on and off. She had no speech articulation problems and exhibited a wide range of emotions, albeit rather despondent and tearful during the session. She was able to understand and respond to questions adequately. Her affect was constricted and her mood was depressed. She displayed some outward signs of anxiety and adequate frustration tolerance, putting forth good effort in attempting tasks. Her thought processes were logical, linear, and reality-bound. She was fully oriented and could perform counting exercises and moderately difficult mathematical

computations. She showed adequate insight and judgment. Her reported activities of daily living included walking her dog, walking her son to school, doing errands and shopping, sometimes going to physical therapy, and making dinner.

Dr. Faust assessed major depressive disorder, moderate, and explained that Paige's depression is substantially aggravated due to chronic health issues and chronic pain. In the area of understanding, remembering, and carrying out instructions, Dr. Faust assessed no significant limitations, but stated that she may have difficulty remembering and carrying out instructions. In the area of attention, concentration and pace, Dr. Faust assessed "only mild deficits" overall. In the area of responding appropriately to supervision and coworkers, Dr. Faust stated that she can be expected to exhibit "some" limitation. In the area of responding appropriately to work pressures, Dr. Faust opined that her depressive symptoms would likely cause difficulty handling the daily pressure of working.

**2. State Agency Reviewers**

On December 14, 2017, state agency reviewer Dr. Swain, Ph.D., reviewed Paige's record and, regarding her mental RFC, opined that Paige could complete routine tasks that do not frequently change. Tr. 101. On March 5, 2018, state agency reviewer Dr. Rivera, Psy.D., agreed. Tr. 117-119.

**E. Testimonial Evidence**

**1. Paige's Testimony**

Paige was represented by counsel and testified at the administrative hearing. She lives with her children. Tr. 39. She was wearing a splint on her right wrist, which she wears when she carries things, and was wearing it that day because she had some shopping to do. Tr. 38-39.

When asked to describe a typical day, Paige stated that she gets her son off to school and

then walks three blocks with her dog, unless her dog wants to go further. Tr. 40. Some days she goes to physical therapy. Tr. 40. After her walk, she rests because she is usually in pain. Tr. 40-41. She was in pain at the hearing and rated it 5/10. Tr. 41. After she rests, she starts planning dinner, then does some house and yard work. Tr. 41. When asked if she has gotten in trouble because of her temper, Paige replied that she has not. Tr. 41. For enjoyment, Paige watches television. Tr. 45. She watches mysteries and shows about law and cops. Tr. 45. She can watch a 1-hour show and follow the plot. Tr. 45.

When asked if she sees a psychiatrist or psychologist, Paige answered that she does not. Tr. 42. She was supposed to, but "I'm still trying to catch up with my medical." Tr. 42. She was still dealing with back surgeries: she has sciatica and bursitis in her right hip. Tr. 42. She is scheduled to start aqua-therapy the next week for fibromyalgia. Tr. 42.

When asked if she could perform a job requiring her to stand 6 out of 8 hours a day, Paige replied that she could not, explaining that she gets a numbing, tingling pain down her right side and low back. Tr. 46. When asked if her back pain improved after her surgery in 2018, Paige stated that it did. Tr. 46. She explained, "It's not as stabbing, and I can walk as before." Tr. 46. Before, she couldn't really walk at all and she was constantly on steroids. Tr. 46.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. The ALJ asked the VE to determine whether a hypothetical individual of Paige's age, education and work experience could perform work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below. The VE answered that such an individual could perform the following jobs that exist in significant numbers in the national economy: cashier, merchandise marker and sales attendant. Tr. 47-50.

## III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his June 18, 2019, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since October 17, 2017, the application date. Tr. 20.

2. The claimant has the following severe impairments: unspecified arthropathies; disorders of the back; obesity; and depression. Tr. 20.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 21.

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: occasional push/pull overhead on the right, but no limitations with push/pull on the left; constantly climb ramps and stairs; never climb ladders, ropes, or scaffolds; constantly balance, stoop, kneel, crouch and crawl; constant overhead reaching on the left but occasional overhead reaching on the right; constant handling, fingering and feeling bilaterally; avoid entirely unprotected heights and hazards; avoid concentrated exposure to extreme cold and wetness; can perform simple, routine tasks, that do not involve high production quotas or piece-rate work. Tr. 23.

5. The claimant has no past relevant work. Tr. 27.

6. The claimant was born in 1969 and was 48 years old, which is defined as a younger individual age 45-49, on the date the application was filed. Tr. 27.

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7. The claimant has at least a high school education and is able to communicate in English. Tr. 27.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 27.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 27.

10. The claimant has not been under a disability, as defined in the Social Security Act, from October 17, 2017, the date the application was filed. Tr. 28.

## V. Plaintiff's Arguments

Paige argues that the ALJ failed to fully develop the record and failed to explain the discrepancies between his RFC assessment and the consultative examiner's opinion. Doc. 15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not fail to develop the record

Paige argues that the ALJ failed to develop the record because he did not obtain treatment

11

notes regarding Paige's back impairment. Doc. 15, p. 10. An ALJ has an affirmative duty to fully develop the factual record upon which the decision rests. *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983). This duty applies regardless of whether the claimant is represented by counsel or not, although the ALJ's duty is heightened when the claimant is not represented by counsel. *Id*. Here, Paige was represented by counsel, so the ALJ did not have a heightened duty to develop the record.

The ALJ's duty to develop the record "is balanced with the fact that '[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant.'" *McCoy for McCoy v. Comm'r of Soc. Sec.*, 2017 WL 3594568, at *9 (N.D. Ohio Aug. 18, 2017) (quoting *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); and *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability)). Moreover, "ALJs are not required to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonable good judgment." *Id*. (quoting *Spurlock v. Comm'r of Soc. Sec.*, 2013 WL 5316908, at *8 (N.D. Ohio, Sept. 23, 2013) (internal quotations and citation omitted). The determination of whether the ALJ has satisfied the duty to develop the record is not a bright line rule, but one that must instead be made on a case-by-case basis. *Id*. (citing *Lashley*, 708 F.3d at 1052; *Cox v. Comm'r of Soc. Sec.*, 615 Fed.Appx. 254, 262 (6th Cir. 2015). Finally, "district courts within this circuit have held that '[w]here there are obvious gaps in the record, the ALJ has the duty to develop the administrative record with respect to the missing evidence.'" *Id*. (citations omitted).

In support of her argument, Paige relies heavily on *McCoy for McCoy v. Comm'r of Soc.*

*Sec.*, 2017 WL 3594568 (N.D. Ohio Aug. 18, 2017). Doc. 15, pp. 11-14. In *McCoy*, the court reversed the decision of the Commissioner, finding that the ALJ had failed to develop the record. The court detailed the claimant's counsel's numerous written and telephonic requests to obtain records from the Charak Center, where the claimant regularly had psychiatric counseling; requests that were unsuccessful. *Id*. at *10. The court reproduced portions of the hearing transcript, wherein the claimant's attorney and the ALJ discussed the missing records at the beginning and the end of the hearing. *Id*. The attorney had asked the ALJ to subpoena the records at the hearing and in writing, but the ALJ did not subpoena the records. *Id*. The court observed that the claimant testified at the March 2015 hearing about her ongoing counseling at the Charak Center and that the balance of the record (without notes from the Charak Center) stopped in October 2012, which left "a gaping hole in the record of over eighteen months between the last psychiatric treating evidence and the ALJ's May 2015 written opinion." *Id*. The Court concluded, "Here, it was specifically brought to [the ALJ's] attention that additional records existed" and there was "an obvious gap in the record." *Id.* (internal quotation marks, alteration, and citation omitted). Moreover, the court stated, the missing records would likely affect the outcome of the ALJ's decision because the missing records, which had later been obtained and were submitted to the Appeal's Council, showed that one of the medical source statements that had been in the record was from the claimant's treating psychiatrist at Charak; "[w]ith a full development of the record, the ALJ may have treated this medical source statement differently." *Id*. at *11. For all those reasons, the court found that the ALJ failed in her duty to fully and fairly develop the record and that remand was warranted. *Id*. at *12.

Here, in contrast, none of the facts relied upon by the court in *McCoy* are present in this case. As described more fully below, Paige suggests, but does not affirmatively state, that there

13

are missing records. Paige's attorney's attempts to obtain additional medical records were not frustrated. Paige's attorney did not inform the ALJ that the record was (allegedly) incomplete. Paige did not testify at the hearing that she treated with any particular doctor or at any particular facility, which may have sufficiently alerted the ALJ to the possibility that there were (allegedly) missing records. There is no gap in treatment in the record. And Paige has not submitted any records (or even affirmatively stated that any missing records exist) that would impact the ALJ's decision.

### 1. Cleveland Clinic records

Paige asserts that she received treatment from providers whose records are not contained in the record transcript. Doc. 15, p. 13 (citing Tr. 312). She does not name the provider(s) from whom she received treatment and whose records are not contained in the transcript. The transcript page she cites, her disability application from April 2018, indicates that Paige had listed a "Dr. Omilanowski" and "staff" from the Cleveland Clinic Foundation whom she saw for her neck and back impairments from March 2017 through March 2018. Tr. 312. It is true, as Paige asserts, that the Cleveland Clinic records in the transcript end in September 2017. Tr. 788. However, in October 2017 (one month after the last Cleveland Clinic record), Paige began physical therapy for hip and back pain at University Hospitals; she also visited the emergency room there in November 2017 and, eventually, underwent lumbar surgery at University Hospitals. Thus, it was reasonable for the ALJ to believe that Paige stopped treating at the Cleveland Clinic and began treating at University Hospitals. See also Tr. 110 (Agency notes from a February 12, 2018, conversation with Paige wherein Paige indicated that she had had treatment with University Hospitals after her bus accident in September 2017). Paige does not affirmatively state that she continued to treat at the Cleveland Clinic after September 2017.

Thus, her suggestion that there are missing Cleveland Clinic records dated after September 2017 is without merit.

### 2. University Hospitals records

Next, Paige argues that her lumbar MRI report and physical therapy sessions indicate that Dr. Eubanks was the referring provider, but examinations from Dr. Eubanks are not in the record. Doc. 15, p. 13. To the extent this is related to Paige's argument that there are missing Cleveland Clinic records (Doc. 20, p. 1), that argument fails because the MRI and physical therapy occurred at University Hospitals and Dr. Eubanks is a University Hospitals provider. In other words, any visits Paige had with Dr. Eubanks would not be contained in the Cleveland Clinic records she complains the ALJ did not obtain.

Paige does not allege that the Agency failed to request the appropriate records for the appropriate period of time from University Hospitals. The record shows that University Hospitals records covering the relevant time period were requested and obtained. E.g., Tr. 1037, 1085, 1095, 1120; see also Tr. 319 (Agency letter to Paige's attorney advising that Paige's file and exhibits were ready to be viewed and that the attorney should add to the record any outstanding records not already in the file). Rather, Paige submits that because Dr. Eubanks referred her for an MRI (which is in the record), sent her to physical therapy (which is in the record), and performed surgery (which is in the record), it follows that there must be records from Paige's visit with Dr. Eubanks. And yet, she submits, there are no records of visits with Dr. Eubanks in the record. Doc. 15, p. 13.

The Court observes that Paige's attorney did not remark at the hearing that there were records missing from visits with Dr. Eubanks and/or University Hospitals. *C.f. McCoy*, 2017 WL 3594568, at *11. In fact, at the hearing, Paige's attorney expressly stated that he had no

objections to the record that was submitted and which the ALJ considered. Tr. 37. On appeal to the Appeals Council, Paige's attorney did not argue that there were any outstanding records from visits with Dr. Eubanks and/or University Hospitals. Tr 337-338. If Paige's attorney did not realize that there were, allegedly, outstanding records from visits with Dr. Eubanks, it is unclear why Paige believes that the ALJ "should have realized that the record was completely devoid of any such notes or recommendations" and that "common sense" should have led the ALJ to develop the record to fill an alleged "gap." Doc. 15, p. 13. Notably, Paige does not even state that there *are* visits with Dr. Eubanks missing from the record. Instead, she simply suggests that there are. Merely suggesting that there should be records that exist falls far short of making a showing that the ALJ failed in his duty to develop the record.[4] *C.f. McCoy*, 2017 WL 3594568.

Finally, Paige contends, "This is not a case where the record was complete enough to provide substantial evidence [of Paige's back impairment] without these records." Doc. 15, p. 13. But Paige does not know what (if any) records are missing, so she is only guessing as to what they might show. The ALJ observed that, prior to the relevant period in 2016, Paige had had a lumbar spine MRI that showed mild degenerative changes. Tr. 25. In November 2017 she visited the emergency room reporting back pain after she had been in a bus accident; upon exam, she had tenderness but full range of motion, a normal gait, and normal strength. Tr. 25. A March 2018 MRI showed mild degenerative changes and, due to intractable lumbar radiculopathy with lateral recess stenosis and an L5-S1 disc herniation with compression of the exiting nerve root, Paige underwent lumbar surgery in April 2018. Tr. 25. A follow-up MRI showed mild degenerative changes. Tr. 25. And Paige testified at the hearing that her back pain had improved after her surgery in April 2018 and that she can walk as she had before, whereas

---

[4] When Paige saw Nurse Walters at University Hospitals in November 2017, she did not have primary care provider and she had not followed up with orthopedics after an initial evaluation following her bus accident. Tr. 1049, 1051.

before her surgery she "couldn't really walk at all" and was on steroids. Tr. 46.

Paige has not shown that the ALJ failed to develop the record.

**B. The ALJ did not err with respect to Dr. Faust's opinion**

Paige argues that the ALJ erred because he found the opinion of Dr. Faust, the consultative examiner, to be persuasive, but he failed to explain why his RFC assessment differed from the limitations found by Dr. Faust. Doc. 15, p. 14. Specifically, Paige complains that the ALJ failed to account for Dr Faust's assessed limitations regarding Paige's ability to interact with others and handle work-place pressures in his RFC assessment or explain why he discounted them. Doc. 15, p. 15. Paige's argument is unavailing.

First, the RFC is the province of the ALJ, not a specific physician, and the ALJ must formulate the RFC based on all the evidence in the record. *See Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. App'x 435, 439 (6th Cir. 2010); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) (the ALJ "is not required to recite the medical opinion of a physician verbatim in his [RFC] finding.").

Next, an ALJ is not required to explain his reasons for declining to include certain limitations. *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."); *Martin v. Comm'r of Soc. Sec.*, 658 Fed. App'x 255, 259 (6th Cir. 2016) (claimant's argument that the ALJ failed to explain reasons for rejecting portions of the non-treating source's opinion fails).

Finally, the ALJ limited Paige to performing simple, routine tasks that do not involve high production quotas or piece-rate work. Tr. 23. The ALJ discussed Paige's consultative

examination with Dr. Faust and Dr Faust's objective exam findings.  Tr. 26.  In concluding that paragraph, the ALJ stated, "Considering the objective medical evidence, I find that the claimant would be limited in her ability to perform more than simple tasks that do not have high production quotas or involve piece-rate work."  Tr. 26.  Notably, Dr. Faust's opinions regarding Paige's ability to understand, remember and carry out instructions and her ability to maintain attention, concentration, persistence and pace were based on his observations during the exam, i.e., objective evidence.  Tr. 1082-1083 (observing that Paige exhibited a latency when responding and some mild attention deficits).  On the other hand, Dr. Faust's opinions regarding Paige's ability to interact with others and respond appropriately to work pressures were based on Paige's reports of her symptoms, i.e., subjective evidence.  Tr. 1083 (Dr. Faust stating that, based on Paige's reports of her symptoms, she "would likely" and "can be expected" to have some limitations in those areas).  Therefore, the ALJ's statement that his RFC limitations were based on the objective evidence from Dr. Faust's exam is a sufficient explanation for the mental limitations included in his RFC assessment.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

Dated: July 14, 2021

*/s/Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge